ARLINGTON HEIGHTS FRUIT CO. et al. v. SOUTHERN PAC. CO. et al.

(Circuit Court, S. D. California. November 22, 1909.)

1. COMMERCE (§ 85*)—RATES—REASONABLENESS—DETERMINATION—INTERSTATE COMMERCE COMMISSION—JURISDICTION.

The final determination of the reasonableness of interstate freight rates is within the jurisdiction of the Interstate Commerce Commission and not with the courts.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 85.*

Jurisdiction of federal courts of suits under interstate commerce act, see note to Bailey v. Mosher, 11 C. C. A. 318.]

2. COMMERCE (§ 89*)—TEMPORARY INJUNCTION—BALANCING EQUITIES.

On an application for a temporary injunction to restrain the enforcement of an increased interstate freight rate, pending determination of its reasonableness by the Interstate Commerce Commission, it is the duty of the court to balance the equities between the parties, and ascertain which of them will suffer greater detriment by the court's action.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 89.*]

3. COMMERCE (§ 89*)—INTERSTATE RATES—INCREASE—REASONABLENESS—TEMPORARY INJUNCTION.

For several years prior to November, 1904, an emergency freight rate of $1 per hundred on lemons from California to the New York market was in force to enable California growers to compete with lemons im-

---

ported from Sicily. In November, 1904, after negotiation, the growers understood the rate was made permanent, whereupon they enlarged their orchards and increased their business on the basis of that factor of expense. This rate was continued for five years and until after the passage of the Payne–Aldrich Tariff Law increasing the duty on lemons from 1 to 1½ cents a pound, whereupon defendants increased the freight rate to $1.15 on the plea of greater cost of labor. There was evidence, however, that the cost of transportation was no greater than before, and that if a temporary injunction restraining the new rate which the growers claimed was unreasonable was not granted pending a determination of the reasonableness thereof by the Interstate Commerce Commission, the growers would be compelled to destroy their lemon trees and put their land to other uses, while the rights of the railroad companies could be protected by bond. *Held*, that the equities were in favor of the growers, and that they were entitled to a temporary injunction on executing a bond conditioned to pay the difference in the rates in case the higher rate was sustained.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 89.*]

Suit by the Arlington Heights Fruit Company and others against the Southern Pacific Company and others for injunction restraining defendants from putting into effect a proposed increased rate of $1.15 per hundred pounds, for transportation of lemons from California to the New York market, pending a determination of the reasonableness of such rate by the Interstate Commerce Commission. Granted.

Joseph H. Call, Asa F. Call, and Levy Mayer, for complainants.

J. W. McKinley, for Southern Pacific Company.

T. J. Norton and U. T. Clotfelter, for Atchison, Topeka & Santa Fé Railway Company.

A. S. Halsted, for San Pedro, Los Angeles & Salt Lake Railroad Company.

MORROW, Circuit Judge (orally). The court is not required at this stage of the proceedings to determine whether the proposed rate of $1.15 per 100 pounds for the transportation of lemons to the New York market is just and reasonable or unjust and unreasonable. Indeed, the final determination of that question rests with the Interstate Commerce Commission, and there is no disposition on the part of the court to intrude upon the jurisdiction of that tribunal.

The present application is for a temporary injunction that will preserve the status quo until a hearing is had upon the merits by the proper authority, the status quo being a charge of $1 per 100 pounds for the transportation of lemons from California to the New York market. What the court is required to do now is to determine from the evidence submitted whether there is a reasonable probability that the complainants will be able to maintain the case set forth in the bill and establish the fact that the proposed increased rate of $1.15 per 100 pounds will be unjust and unreasonable; and whether pending such a hearing upon the merits the complainants will suffer an irreparable injury. In reaching conclusions upon these questions it is the duty of the court to balance the equities between the parties and ascertain which of them will suffer the greater detriment or inconvenience by the action of the court. If the balance of detriment or inconvenience, in the event the temporary injunction is refused, is

against the complainants, then the injunction will be granted. But if, on the other hand, the balance of detriment or inconvenience is against the defendants, in the event the temporary injunction should issue, then it should be refused. In the present case, if the temporary injunction is issued, the defendants will be denied the right to collect the increased rate of 15 cents per 100 pounds until the Interstate Commerce Commission has determined whether such increased rate is just and reasonable or unjust and unreasonable, but in the meantime the defendants will be fully secured in a bond to indemnify them for the difference between the proposed rate and the rate which they may collect.

Now, how will it be with the complainants if the temporary injunction is refused? They must pay the increased rate, which it is estimated will amount to about $250,000 in one year. If it is finally determined that this rate is unjust and unreasonable they may recover of the defendants the amount so exacted. But what will be their situation or condition pending this determination? It appears from the evidence that the lemon growers cannot pay the increased rate and market their crops in the Eastern markets at a profit. They must go out of business if required to pay the increased rate. They will be compelled to destroy their lemon trees and put their land to other uses. This is a detriment and inconvenience in addition to, or rather aside from, the difference in rate. If the equities of the parties related only to the difference in rate they would be equally balanced and the temporary injunction would be refused. But there is evidence before the court that the equities are not so balanced. The complainants will suffer an irreparable injury by the increased rate not measured by the difference between that and the present rate, and this fact clearly balances the equities in favor of the complainants. Moreover, there is evidence that for some years prior to November, 1904, the present rate of $1 per 100 pounds was an emergency rate established by the carriers to enable the shippers to meet the special conditions of the season and of the Eastern markets. But in November, 1904, after some negotiations between the parties, the rate was made a permanent rate, or at least the lemon growers so understood it, and thereupon, having faith that such permanent rate would be continued, they have enlarged the area of their orchards and increased their business upon that basis of this factor of expense. This rate has now been continued for five years. The defendants deny that they ever gave the complainants to understand that the rate of $1 per 100 pounds was to be a permanent rate, but I think the evidence furnished by the bill and supported by the affidavits satisfactorily establishes the fact that the complainants, as a result of their negotiations with the defendant, were given to understand that the rate of $1 per 100 pounds would be a permanent rate upon which they could go on and develop this industry, and the fact that it has been continued for five years indicates that the rate was to be permanent, and is prima facie evidence that the rate is not unreasonably low.

Now, what has occurred since November, 1904, to justify the defendants in increasing the freight rate to $1.15 per 100 pounds? There is some evidence that there has been an increase in the cost of labor,

but this fact applies with equal force to the business of both parties. The entire cost of transportation is not, in fact, any greater. The services rendered by the carriers do not appear to be any more expensive as a whole than they were in 1904, if indeed they are as expensive now as they were then. Where, then, is the change of condition? Why the increased rate? It appears to be confined exclusively to the legislation by Congress respecting the tariff.

By the Dingley Tariff Act of July 24, 1897, c. 11, § 1, Schedule G, par. 266, 30 Stat. 172 (U. S. Comp. St. 1901, p. 1651), the duty on imported lemons was 1 cent per pound. This duty was raised by the recent act of August 5, 1909, to 1½ cents per pound. This increase of duty appears to have been made upon representations to Congress that it was necessary to have such a protective duty to enable the complainants to sell their product in competition with the Italian or Sicilian lemons in the Eastern market. It is represented that in Italy or Sicily the cost of labor in producing lemons is only 25 per cent. of what it is in California and that the freight charge from Sicily to New York is only 25 per cent. of the freight charge on lemons from California to New York. As, for example, it costs $1 in labor to produce 100 pounds of lemons in California, while it costs only 25 cents to produce the same quantity of lemons in Sicily. The freight charge on 100 pounds of lemons from California to New York is $1, while the freight charge on the same quantity of lemons from Sicily to New York is 25 cents. It was upon representing such facts to Congress that the duty was increased one-half cent per pound. It was increased because freight and labor are so much higher in this country than in Sicily, because the cost of freight and labor in this country was for each $1 per 100 pounds, and the cost of freight and labor for the foreign producer was for each only 25 cents per 100 pounds. Congress then had in view two facts justifying an increase in the duty on lemons. One was the cost of labor in this country and the other was the fact that the lemon growers in California were required to pay the railroad companies $1 per 100 pounds for the transportation of their lemons to the New York market.

The purpose of Congress was to protect American industry. But does any one suppose that Congress would have made such an increase had it been suggested, or even suspected, that the railroad companies would immediately increase their freight rate and appropriate a portion of this protection for their benefit? Manifestly not. The policy of imposing protective duties is for the benefit of the producer and to encourage home productions and home manufactures, and not to increase the cost of railroad transportation. Its ultimate purpose is to develop the country, encourage diversified industries, and save our markets for our own people on at least something like equal terms with the foreign producer. The wisdom of this policy is not a question for the judiciary. It is purely a legislative question. But when such a policy has been adopted and placed on the statute book the courts must give it effect when the issue is presented.

The facts submitted by the defendant in support of the proposed increase of rate are very interesting and make a plausible showing in

support of their claim to a higher freight rate than that now prevailing, but I am not satisfied that they are entitled to share in the benefit of this particular increase in the customs duty. Perhaps, later on, when the industry of the lemon grower is firmly established and the market fairly equalized for the home producer, the defendants may properly increase the rate to correspond with other citrus fruits. But for the present the equity of keeping the present rate appears to be with the complainants until the subject can be investigated by the Interstate Commerce Commission. The complainants should give a bond in the sum of $250,000, conditioned expressly that in the event a rate in excess of the present rate is determined to be just and reasonable, the complainants will pay to the railroad companies the difference between the present rate and such rate as determined by the Interstate Commerce Commission. That, I believe, was the condition of the bond given in the Lumber Case, Northern Pac. Ry. Co. v. Pacific Coast Lumber Mfrs.' Ass'n, 165 Fed. 1, 91 C. C. A. 39. Let a temporary injunction issue as prayed for in the bill of complaint.

3. WATERS AND WATER COURSES (§ 188*)—WATER COMPANY'S FRANCHISE—TERMINATION—CONTINUED SERVICE—LICENSE.
    Where a water company, after the termination of its franchise, continued to furnish water, it did so according to a quasi contractual relation, which was a mere license from which either it or the city could withdraw at will.
    [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 287; Dec. Dig. § 188.*]

4. WATERS AND WATER COURSES (§ 188*)—WATER COMPANIES—TERMINATION OF FRANCHISE—CONTINUANCE OF SERVICE—REGULATION.
    A water company continuing to furnish water after the termination of its franchise is subject to regulation by the state or the municipality.
    [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 287; Dec. Dig. § 188.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes